**IN THE DISTRICT COURT OF THE UNITED STATES FOR THE**

**MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION**

```
UNITED STATES OF AMERICA    )
                            )    CRIMINAL ACTION NO.
     v.                     )       2:21cr356-MHT
                            )           (WO)
JONATHAN LASHAUN DILLARD    )
```

**OPINION AND ORDER**

Defendant Jonathan Lashaun Dillard was charged with one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1). The court now considers whether he has the mental capacity to stand trial, that is, whether he is currently suffering from a mental disease or defect rendering him mentally incompetent such that he is unable to understand the nature and consequences of proceedings against him or to assist properly in his defense. *See* 18 U.S.C. § 4241(a). Based on the evidence presented, including three psychological reports and expert testimony at an in-person hearing, the court finds that he is mentally competent to stand trial. *See* Psych. Evaluation (Doc.

24); Psych. Evaluation (Doc. 49); Update to Psych. Evaluation (Doc. 98); Aug. 26, 2022, R.D. Hearing Tr.

The question of Dillard's competence was first raised by his counsel, who noted that Dillard had "extreme difficulty understanding the nature of the charges" and "expressed confusion and a general lack of understanding [as] to the nature of the charges and the proceedings." Motion for Competency Evaluation (Doc. 9) at 1. The magistrate judge ordered a psychological evaluation. This assessment, dated December 17, 2021, was performed by Dr. Leticia Armstrong, a licensed Bureau of Prisons (BOP) psychologist, and Weronika Nowak, a predoctoral intern, between September 30 and November 14, 2021. Their report found that Dillard's "legal competency could not be assessed as he refused to participate in legal interviews," but noted that "there is substantial evidence ... that Mr. Dillard deliberately feigned severe psychiatric symptoms during the present evaluation, and that he does not appear to be suffering from a severe

mental disease or defect that would significantly interfere with his ability to assist counsel in his defense and his rational understanding of the proceedings against him." Psych. Evaluation (Doc. 24) at 22-23. The report also stated that Dillard's "decision-making throughout the present evaluation did not ever appear impacted by psychotic symptoms" and that he "displayed an ability to appropriately comport his behavior when he chose to do so." *Id*. at 23.

In response to a motion from Dillard, the court approved funds for a second competency evaluation, conducted by licensed psychologist Dr. Peggy Flanagan. The court received a report from Dr. Flanagan, dated March 18, 2022, that draws on evaluations conducted by videoconferencing in February and March 2022.

Based on representations made on the record on June 15, 2022, the court ordered defense counsel to arrange for Dr. Flanagan to update her competency evaluation "in light of defendant Dillard's recent suicidality and other

3

evidence that he continues to suffer from mental illness." Order (Doc. 85). The updated report from Dr. Flanagan, dated August 16, 2022, and based on additional evaluations conducted on April 21 and July 13, 2022, was inconclusive as to Dillard's current competency to stand trial.[1]

To clarify Dr. Flanagan's updated evaluation, the court held an in-person hearing with Dillard, during

---

1. Dr. Flanagan's report is inconsistent as to the date of her most recent evaluation of Dillard. *Compare* Update to Psych. Evaluation (Doc. 98) at 1 ("Date of Evaluation: ... July 13, 2022") *with id.* at 2 ("I met with Mr. Dillard on June 13, 2022, for approximately 30 minutes."). This confusion between June and July reoccurred at the hearing. *See* Aug. 26, 2022, R.D. Hearing Tr. at 5-6 ("Q. ... [Y]ou met with him on June 13th. What was his behavior on that date? A. So on June 13th, his behavior was still very much in that manner. Are you speaking of July 15th, our most recent meeting? Q. I'm looking at June 13th, I believe, where you said he was entirely silent for 30 minutes. A. Oh, that-- okay." (testimony of Dr. Flanagan)). Given that the court ordered Dr. Flanagan to reexamine Dillard on June 17, *see* Order (Doc. 85), it appears that the date in question must be July (rather than June) 13, 2022.

which Dr. Flanagan testified by videoconferencing. Dr. Flanagan again reported an inconclusive result. She was "not able to conclude at this point that [Dillard] is competent" and was likewise unable to conclude that he is incompetent.[2] Aug. 26, 2022, R.D. Hearing Tr. at 24-25. Still, her remarks to the court are instructive.

Dr. Flanagan noted that, at the "most recent evaluation" in July, Dillard "was entirely silent and did not move" nor "make eye contact." Id. at 6. This behavior could be "entirely volitional" or, alternatively, reflect a mental issue like catatonia or

---

2. Dr. Flanagan attributed her inconclusive report to "the limited nature in which [Dillard] was able to interact with me at [the July 13 evaluation] ... and also the acknowledgment of the previous feigning and exaggeration of symptoms that he's had in the past." Aug. 26, 2022, Hearing Tr. at 10. She recommends Dillard "be hospitalized ... until the resolution of his case," id. at 12, but acknowledged that if he were hospitalized, "it would be because [the court] felt that the evidence indicated incompetency," id. at 27.

5

"an extreme internal preoccupation" that renders him "not able to attend to outside sources." *Id*.

Dr. Flanagan's testimony shed more light on these possibilities. At the July meeting, Dillard maintained normal posture and breathing and "did not display any symptomology" that indicated auditory hallucinations. *Id.* at 13. Similarly, Dr. Flanagan stated that "it would be highly atypical to have catatonia that comes out of nowhere .... One of the things that he further didn't have with catatonia is sometimes you see waxy flexibility .... People will maintain odd postures. That did not occur." *Id.* at 23.

In any event, Dillard's conduct at the August 2022 hearing offers further evidence as to his current level of competency. At the hearing, he was, at times, agitated and disruptive, but also displayed a fairly sophisticated understanding of various courtroom actors and the instant legal proceedings.

6

For example, Dillard was able to describe the role of lawyers, juries, and prosecutors. *See id.* at 34-35.³ He discussed cogently the idea of a plea agreement and the possibility of prison time, including the tradeoff between staying in custody during an extensive competency-determination process versus beginning to serve his sentence. *See id.* at 32 ("Back and forth, when I can just go on ahead and sign the plea agreement and then go on and get my time out of the way."); *id.* at 33 ("I could be in prison right now and be, like, fixing to get out."). These exchanges confirm that Dillard can understand the nature and consequences of the criminal proceedings brought against him.

---

3. Dillard at one point did not straightforwardly describe the role of a judge. *See* Aug. 26, 2022, R.D. Hearing Tr. at 34-35. Given his demeanor throughout the hearing and his clear understanding of other aspects of the legal process, however, the court finds that that exchange was likely a product of Dillard's "showing off" for the court rather than a genuine lack of understanding.

7

Dillard also comprehended the function of a competency hearing. He personally engaged with the psychological evaluations, citing to specific passages in the BOP report and noting his objections to their contents to the court. *See id.* at 33-34 ("Page 22, the second paragraph .... It say, 'This opinion is offered out of an abundance of caution.' Okay. Basically, like, the closing statement of this whole evaluation, right, is based upon, you know, this is opinion. When you first read the first page of this evaluation, it will tell you that this is an opinion, stating clearly that I have no evidence but this to say that he is malingering."). He further suggested how that report and Dr. Flanagan's expert opinion could interact to produce a more favorable result. *See id.* at 41 ("And it, [the BOP report], says, 'Additional information regarding the history--history, courses, symptoms, causes, treatment responses, and other factors of his apparent symptoms of a p[erceived] lack [of] behavioral control, auditory or visual

8

hallucinations, could change the clinical and forensic opinions in this current report.' That mean if they had any records to show them that, you know, this is him, [Dillard], like Dr. Flanagan['s opinion], then they would change--that would change the whole [BOP] opinion. All of this is based upon an opinion that people who come into the hospital usually are malingering."). He also understood the court's role in evaluating evidence insofar as he twice asked the court to exclude the BOP report from consideration. *See id.* at 40-41 ("But can we throw this out, Your Honor, if this evaluation is based upon 'caution?'"). While Dillard's demeanor was, at times, distressed, his arguments and actions do not support a finding that he is unable to assist properly in his own defense.

To be sure, Dillard's conduct and affect fluctuated during the hearing. Throughout, he made claims about being denied medicine he has been prescribed that, if true, raise serious concerns for this court about the

9

conditions of his current custody.  *See id.* at 29-31, 35-39, 42.  On two occasions, he expressed confusion when asked by the court if he wanted to represent himself. *See id.* at 35 ("Sir, to be honest with you, I don't even know what's going on."); *id.* at 36.[4]  And at the end of the hearing, Dillard mentioned voodoo, connecting it to the denial of his medication.  *See id.* at 36-38 ("The only thing wrong is I just want to take my medicine. If I could take my medicine, all these people who got witchcraft and voodoo on me won't be able to control me that good, and then I could sleep at night.").  While these incidents trouble the court, they do not rise to

---

    4.   Dillard seemed to be in sporadic conflict with his counsel. *See id.* at 34-35 ("Only thing I need ... is for him, [defense counsel], to give me my motion of discovery, which he was refuse--refusing to do. I asked him for simple things, and he won't do it .... He want to be on my case, and then I don't need him on my case. I'm my own lawyer.").  When twice asked if he wanted to represent himself, however, Dillard did not clearly answer yes or no.  *Id.* at 35-36.

10

the level of undermining his competency to stand trial at this time.

Nonetheless, the court wishes to underscore serious questions about access to medicine raised by Dillard and Dr. Flanagan. Dillard is currently prescribed two antipsychotics and an antidepressant, *id.* at 8-9, in response to a "very well documented" history of mental illness, including active and paranoid delusions, *id.* at 11. Dr. Flanagan reviewed records, current at least up to mid-August, that indicate issues with medication adherence. *See id.* at 8-10. Per Dr. Flanagan, those records document both Dillard's refusing medication and jail-pharmacy supply problems. *See id*. at 8. For his part, Dillard reports being denied his medication, even noting that he would prefer hospitalization because "them nurses bring me my medicine. These nurses in the jail, they won't give me my medicine." *Id.* at 37. The

11

combination of this testimony, while not determinative as to competence, gives the court significant pause.[5]

Therefore, pursuant to 18 U.S.C. § 4241(a) and based upon the psychological evaluations and an in-person hearing, the court concludes that Dillard is not currently suffering from a mental disease or defect such that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

\*\*\*

Accordingly, it is ORDERED and DECLARED that defendant Jonathan Lashaun Dillard is declared mentally competent to stand trial in this case.

DONE, this the 24th day of October, 2022.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE

---

5. Dillard also reports that he has been unable consistently to "take my medicine because I don't have anything to eat." *Id.* at 31; *see id.* at 30 (stating that a jail doctor noticed Dillard lost 30 pounds and changed his food situation "so now I can take my medicine").

12