IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

```
UNITED STATES OF AMERICA    )
                            )    CRIMINAL ACTION NO.
     v.                     )      2:21cr356-MHT
                            )          (WO)
JONATHAN LASHAUN DILLARD    )
```

OPINION AND ORDER

Litigation takes time.  And time brings change.  In October 2022, this court found defendant Jonathan Lashaun Dillard competent to stand trial on the charge of possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1).[1]  Now, eight months later, changed circumstances require that determination to be revisited.  For the reasons described below, the court finds that Dillard must again be evaluated for competency by the Bureau of Prisons (BOP).

─────────────────────

1. A superseding indictment was later filed in June 2023, but that charge remains the sole count.

## I. STANDARD FOR COMPETENCY

A defendant must be mentally competent in order to stand trial.  Federal statute provides that a hearing on such mental competency is warranted whenever

> "there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense."

18 U.S.C. § 4241(a).  Notably, this provision is in the disjunctive: a competency hearing is needed when there is reasonable cause to believe either that a defendant is unable to understand the proceedings against him *or* that he is unable to assist properly in his own defense. Before any competency hearing, the court is authorized to order a "psychiatric or psychological examination of the defendant."  *Id.* § 4241(b).  The ultimate determination of competence is made by "the court" under a "preponderance of the evidence" standard. *Id.* § 4241(d).

2

## II. BACKGROUND

In October 2022, based on evidence presented at an August 2022 hearing, the court previously found that Dillard was mentally competent to stand trial. *See United States v. Dillard*, No. 21-cr-356, 2022 WL 14068643 (M.D. Ala. Oct. 24, 2022) (Thompson, J.).

However, underlying this ultimate finding were several troubling observations. First, while BOP, which conducted a longitudinal evaluation (i.e., an evaluation over a period of residence at a BOP facility), noted that

> "there is substantial evidence ... that Mr. Dillard deliberately feigned severe psychiatric symptoms during the present evaluation, and that he does not appear to be suffering from a severe mental disease or defect that would significantly interfere with his ability to assist counsel in his defense and his rational understanding of the proceedings against him,"

it also emphasized that Dillard's "legal competency could not be assessed as he refused to participate in legal interviews." *Id.* at *1 (quoting Psych. Evaluation (Doc. 24) at 22-23). Second, in response to BOP's evaluation, defense counsel arranged for another evaluation by Dr.

3

Peggy Flanagan, who ultimately was "not able to conclude ... that [Dillard] [wa]s competent" and was likewise unable to conclude that he was incompetent. *Id.* at *2 (quoting Aug. 26, 2022, R.D. Hearing Tr. at 24-25). Third, the court observed at the competency hearing that Dillard "was, at times, agitated and disruptive," *id.*, and that his "conduct and affect fluctuated," *id.* at *3. Finally, the court at that time "underscore[d] serious questions about [his] access to medicine." *Id.*

However, despite these concerns, the court found Dillard to be competent because, among other things, he "was able to describe the role of lawyers, juries, and prosecutors," "discussed cogently the idea of a plea agreement and the possibility of prison time, including the tradeoff between staying in custody during an extensive competency-determination process versus beginning to serve his sentence," and, in general, "displayed a fairly sophisticated understanding of various courtroom actors and the instant legal proceedings. *Id.* at *2. For the most part, the court's

**4**

focus was on the first prong of the competency statute at § 4241(a) insofar as Dillard ultimately appeared able, at that point in time, to understand the proceedings against him.


## III. RECENT CONCERNS

This case has not stood still in the intervening months since the court's finding of competency, though it is not necessary to recount the full details here.  In recent months, Dillard pleaded guilty pursuant to a plea agreement, was allowed to withdraw that plea, and asked to represent himself.  While his conduct in court remained worrying during these proceedings, he eventually became so obstructive during two hearings in 2023--one on June 13 on whether he should be allowed to represent himself and another on June 14 on whether his then-upcoming trial should be continued so that the court could revisit his competency in light of changed circumstances--that the case could not proceed *for now*.

At these two hearings, Dillard's conduct was so disorderly as to convince the court, as well as counsel for the government and the defense, that the case could not move forward for trial on the date set. Defense counsel put it succinctly at the June 14 hearing: "So, based on what we are observing today, if that would be his behavior on the [day of trial], we would not be able to go forward." June 14, 2023, R.D. Hearing Tr. at 3. Defense counsel explained further that, "if there was a jury here ... they wouldn't be able to hear what's going forth if he's speaking louder than any evidence we could put on in the matter." *Id.*

Dillard's conduct at the June 13 and June 14 hearings not only substantially undermined the court's earlier finding with regard to the first prong of the competency determination (viz. that he appeared able to understand the proceedings against him), but also highlighted that the second prong of the competency issue is very likely not currently satisfied (viz. that he is able to assist properly in his own defense).

6

The court will now describe in more detail his
conduct at the two hearings.

### A.

First, the court considers what happened at the June
13 hearing on Dillard's request to represent himself.  To
begin, Dillard indicated that he was experiencing
significant aural and visual disturbances that interfered
with his ability to understand and participate in court
proceedings, echoing his reports of such disturbances at
the August 2022 hearing; importantly, however, the claim
that these disturbances interfered with his court
participation was absent from the earlier August hearing.

In that vein, Dillard reported on June 13 "hearing
voices in [his] mind," *id.* at 8; hallucinating in ways
that made it "very hard ... to understand, like,
anything," *id.* at 9; and being controlled by demons, *see
id.* at 54-55.  He laughed audibly during the court's
colloquies with attorneys, *see id.* at 48, and repeatedly
talked loudly and often incoherently as proceedings were

7

ongoing and others (including the court and all counsel) were speaking, *see* June 14, 2023, R.D. Hearing Tr. at 2-3.  A point was reached where, in order to proceed, the court and counsel simply had to ignore him and talk over him.  Evidence was also presented that he had threatened at least one of the U.S. Marshals with physical violence. *See* June 13, 2023, R.D. Hearing Tr. at 53 (Marshal: "[H]e made a couple of derogatory comments with some curse words but the threat made towards me is, if he wasn't in restraints, that he would basically have an altercation. We would fight it out.").

Based on these issues and on other interactions with Dillard, counsel for both parties raised serious concerns about Dillard's current competency to stand trial. *See, e.g., id.* at 21-22 (Defense counsel: "I'm not sure if he is competent."); *id.* at 36 (Government counsel: "I don't know if the defendant is competent."); *id.* at 42 (Government counsel: "I cannot sit here and say this man is competent to be tried ... I have concerns ... I don't believe he understands the serious of what's going on

here today.").  The court appreciates their candor.  In
addition, Dillard's defense counsel informed the court
that his mental state was materially affecting her
ability to represent him.  *See id.* at 51.  Indeed, he
appeared at times to be acting against his own legal
interests, including with respect to his counsel's advice
and recommendations about his potential exposure to a
significant mandatory minimum sentence.  *See id.* at 47;
*see also id.* at 46-51 (discussing difficulties in the
court-appointed defense counsel's efforts to work with
and advise Dillard).

Worryingly, Dillard did not seem to fully appreciate
the potential consequences of the charges against him
and, in particular, of any potential conviction.  When
asked by the court, he denied understanding that he faced
a maximum sentence of up to life in prison and up to a
$ 250,000 fine.  *Id.* at 27.  More broadly, Dillard's
verbal statements called into question his understanding
of the nature and consequences of the proceedings
(including any potential sentencing)--and, as a result,

his ability to assist in his own defense. Remarks in this vein included his concerning assertion that "I will represent myself and, you know, you [the court] will be very lenient with me." *Id.* at 40.

Accordingly, government counsel raised concerns about whether Dillard understands "the nature and gravity of these proceedings or the criminal trial that's coming up," of "surrendering his right to counsel," or of "representing himself in federal district court." *Id.* at 43. Counsel also noted that "the defendant's flippant attitude towards the district court," including ignoring the court's "repeated instructions ... [and] admonishments" about his behavior in court, might indicate "a lack of understanding as to the role ... the district court may play in his future" if found guilty. *Id.* at 43-44; *see id*. at 45. The court finds that these concerns are well taken and comport with its own observations.

Finally, and perhaps most concerningly, Dillard, spontaneously and without conferring with counsel,

10

stated: "Can we do that and then just go on ahead -- can we go ahead and have a trial now without the jury? Just me, you, and us, if I plead guilty?" *Id.* at 31-32.  Of course, the court was then worried that, without having been counseled and without counsel having explained his rights to him, he was about to make an admission of guilt in open court.

Dillard also repeatedly represented that he has faced ongoing issues in getting access to his medication and to the amount of food necessary to take such medication. *See id*. at 11, 21, 54, 56-57.  Referring Dillard for further psychological evaluation, as discussed further and ordered below, is likely to increase both his access to and compliance with an appropriate medication regime. Importantly, it will also bring BOP's expertise to bear in determining which, if any, of Dillard's prescribed medications require--as a matter of medical

necessity--certain conditions for their administration, including certain frequencies or amounts of food.[2]

_____

2. After the August 2022 hearing, the court raised serious concerns about Dillard's access to medicine:

> "Dillard is currently prescribed two antipsychotics and an antidepressant in response to a 'very well documented' history of mental illness, including active and paranoid delusions. Dr. Flanagan reviewed records, current at least up to mid-August, that indicate issues with medication adherence. Per Dr. Flanagan, those records document both Dillard's refusing medication and jail-pharmacy supply problems. For his part, Dillard reports being denied his medication, even noting that he would prefer hospitalization because 'them nurses bring me my medicine. These nurses in the jail, they won't give me my medicine.'"

*United States v. Dillard*, No. 21-cr-356, 2022 WL 14068643 (M.D. Ala. Oct. 24, 2022) (Thompson, J.) at *3 (citations omitted).

> "Dillard also reports that he has been unable consistently to 'take my medicine because I don't have anything to eat.'"

*Id*. at *3 n.5 (citations omitted); *see id.* (reporting Dillard's statement that a jail doctor noticed he lost 30 pounds and changed his food situation so that he could take his medicine).

12

At that same June 13 hearing, Dillard raised the specter, also raised by BOP in its report submitted for the first competency hearing, that he might be malingering.  He stated: "To be honest with you, so I've been faking a whole lot."  *Id.* at 18.  While the court is, of course, not a trained mental-health professional, it did not appear at the June 13 hearing that Dillard was malingering about his mental-health issues.  It appeared instead that he was experiencing genuine distress and agitation that interfered with his ability to understand and assist in court proceedings.  The court can see no advantage to his engaging in disruptive behavior that makes it more likely that he will be again returned to a BOP facility and would thus prolong his incarceration.  In fact, it appeared that his admission that he might be "faking" might instead be part of his ramblings and incoherency--and of the mounting body of evidence raising questions about his competence.

The court was also struck by Dillard's express request for mental-health treatment.  Indeed, it appears

13

that he was, at times, asking to be sent back to a BOP hospital. *See id*. at 7-8, 14; *see id.* at 55 ("I love to be in a hospital.  You know, where I can talk to a therapist and they can get me on my medicine, like, you know, get some help.  I really need some help.").  This perhaps represents a breakthrough in Dillard's personal journey toward stabilizing his mental health and the court anticipates that this may lead to his increased cooperation in future proceedings in this case.  In particular, the court hopes and expects that Dillard may now be more cooperative with future professionals conducting psychological evaluations than he has been in the past.  *See generally* Psych. Evaluation (Doc. 24).

### B.

Second, the court considers the June 14 hearing on continuing the trial (then scheduled for June 20) so that Dillard could be committed for mental evaluation at a BOP facility.   Dillard continued to talk loudly and

**14**

incoherently, so much so that the court and parties just had to talk over him.

A sampling of his incoherence, which the court reporter managed to record, is as follows:

> "And all these people keep talking to me, surrounding me, taking pictures of me and stuff like that.  I don't know what they think, like I'm famous or some superstar, bow down to me and, you know, like, looking up to me, like, you know, like, you know, I'm just losing my mind. You know, I feel like God, you know -- because I feel like, you know -- I feel like I got all the power, you know.  I don't think nobody is more powerful than me in the world."

June 14, 2023, R.D. Hearing Tr. at 5.

At that hearing, defense counsel, as stated above, represented that the case could not go forward in light of Dillard's conduct:

> "[Defense counsel]: Your Honor, based on -- if that's going to be the behavior that we're going through, there's no way on the 20th that we could get a jury in here and be able to effectively get him through a trial proceeding.  So I would have to say if that's going to be his behavior, we won't –
>
> "THE COURT: When you say 'that,' you mean the behavior we're witnessing right now?

> "[Defense counsel]: The behavior right now.  The
> speaking out right now, Your Honor.  Because if
> there was a jury here, of course, we would be
> prejudiced with a jury, and they wouldn't be
> able to hear what's going forth if he's speaking
> louder than any evidence that we could put on in
> the matter, Your Honor.  So based on what we're
> observing today, if that would be his behavior
> on the 20th, we would not be able to go forward."

*Id.* at 3.  The bottom line for the court (and for counsel

for both parties) was that this case could not proceed,

as set for trial, in light of Dillard's disruptive and

self-harming conduct.


C.

As a final note, the court humored Dillard across

both the June 13 and June 14 hearings, allowing him to

speak and to participate, even as he became increasingly

disruptive.  While the court has been as gracious as

possible with Dillard while he is agitated, there remains

a significant concern based on Dillard's demeanor that,

if the court had instead tried to restrain him verbally

or physically, he would have become physically combative.

To be clear, he has not been physically combative in the

court's presence thus far, but the court's observations require recording this concern as it assesses Dillard's current ability to participate in court proceedings.

### D.

Finally, the court stated earlier that the case could not proceed *for now* to jury trial. The court emphasized "*for now*" because there is still nonetheless the open question of whether Dillard is feigning his symptoms, including his extremely disruptive current conduct in court. If, after the further proceedings outlined in this order, the conclusion is that he is competent and is just feigning or malingering, a jury trial in this case would not be foreclosed. The court could still explore, among other things, removing him from the courtroom and allowing him to participate in the proceedings by videoconferencing from another location.

## IV. FURTHER EVALUATION

Given these changes and concerns in recent months, the court now has serious doubts as to Dillard's current mental competence.  At the June 13 and June 14 hearings, his speech and behavior raised significant questions for the court as to his ability to understand the criminal proceedings against him and to assist, either with counsel or as his own representative at trial, in his defense.  Therefore, it appears that there is reasonable cause to believe that Dillard may currently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him and to the extent that he is unable to assist properly in his defense.

Accordingly, the court will place Dillard in the custody of the Federal Bureau of Prisons for further mental-competency observation and evaluation.  However, the court further requests, in addition to such evaluation, that the reviewing medical professionals also

18

assess and evaluate Dillard's current need for psychiatric and other mental-health medication (and the protocols for administration thereof), as described below.

\*\*\*

Accordingly, it is ORDERED that:

(1) The United States Marshal for this district shall immediately remove defendant Jonathan Lashaun Dillard to the custody of such federal institution as may be designated by the Attorney General, where he is to be committed for the purpose of being observed and examined for a period of 30 days by one or more qualified psychiatrists or psychologists at the institution, pursuant to the provisions of 18 U.S.C. §§ 4241 and 4247(b)(c).

(2) The examining psychiatrists or psychologists conducting the mental examination of defendant Dillard shall report in writing to this court within 30 days from the date of defendant Dillard's arrival at the institution as to their findings, opinions and

19

conclusions relative to the competency or incompetency of defendant Dillard, and specifically report to and advise this court whether or not in their opinion defendant Dillard may be currently so mentally incompetent as to be unable to understand the proceedings against him or properly assist in his own defense.  The examining psychiatrists or psychologists conducting the mental examination of defendant Dillard shall include in their report whether defendant Dillard should be prescribed and receive any medication and, if so, what that medication should be; whether, if they can tell, he has been receiving such medication before; and how he should receive any medication he requires (in terms of dosage, frequency, whether it should be taken with food (and, if so, the amount and timing of such food)).  The examining psychiatrists or psychologists are ADVISED that a reasonable extension of this deadline may be granted if the required application is made pursuant to the provisions of 18 U.S.C. § 4247(b).

(3) Defendant Dillard shall be incarcerated and shall remain at the institution designated by the Attorney General until the examination has concluded. The examining authority is DIRECTED to notify the United States Marshal for the Middle District of Alabama at the conclusion of the examination, and the Marshal shall promptly return defendant Dillard to the Middle District of Alabama for further proceedings.

DONE, this the 30th day of June, 2023.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE